UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

STEPHEN WEATHERSBY,          )
                Plaintiff,   )
                             )
        vs.                  )          1:08-cv-615-LJM-TAB
                             )
ASTRA USA, INC. d/b/a ASTRAZENECA   )
PHARMACEUTICALS,             )
                Defendant.   )

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on defendant's, Astra USA, Inc. d/b/a AstraZeneca

Pharmaceuticals ("AstraZeneca"), Motion for Summary Judgment (Dkt. No. 33).  Plaintiff's,

Stephen Weathersby ("Weathersby" or "Stephen"), complaint against AstraZeneca alleges

race discrimination and retaliation.  Dkt. No. 1 at 5-6.[1]  For the reasons set forth below,

AstraZeneca's Motion for Summary Judgment (Dkt. No. 33) is **GRANTED in part and**

**DENIED in part**.

## I.  BACKGROUND[2]

Weathersby, an African American male, began working for AstraZeneca, a

pharmaceutical company, on June 9, 2003.  Prior to working at AstraZeneca, Weathersby

worked for seventeen years at the pharmaceutical company Glaxo. He joined AstraZeneca

as a District Sales Manager ("DSM") for the Indianapolis District in the area of Central

---

[1] Weathersby's complaint also alleged sex discrimination, but he voluntarily
dismissed this claim.  Dkt. No. 44 at 2 n.1.

[2] The disputed evidence is described in the light most favorable to the nonmoving
party, Weathersby.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).

Nervous System Specialty Care.  Weathersby's main responsibilities as a DSM were "to develop sales professionals and drive business 'by observing [his team members'] interactions with key customers, providing them with individual coaching, feedback and inspiration, [and developing them] for success in [their] current role and for future growth.'" Dkt. No. 38 at 4.

For his first year with AstraZeneca, Weathersby reported to Regional Sales Director J. Mike Zubillaga ("Zubillaga").  On December 31, 2003, Zubillaga evaluated Weathersby and determined that Weathersby met or exceeded all expectations.  Weathersby Dep., Ex. 13.  Zubillaga also noted the following:

> Stephen should take credit for his leadership restoring credibility with management and AstraZeneca with the Indianapolis District.  He made himself available from the first day he took over the district and has continued to build respect with his open and honest style in addition to stressing "Work/Life Balance."  Now that Stephen has addressed the issues with the Indianapolis District he must re-focus his new team on the "Main Thing," driving Seroquel market share.

*Id.* at 6.  Zubillaga gave Weathersby an overall rating of "Good: Performance met overall expectations."  *Id.* at 7.

For the last part of 2004, Weathersby reported to Jeff Mollison ("Mollison").  On November 18, 2004, Mollison alerted James Berkhout ("Berkhout"), Mollison's soon-to-be replacement, that Weathersby and several of his direct reports failed to disburse their expense reports per AstraZeneca's policies.  On December 31, 2004, Mollison evaluated Weathersby and determined that Weathersby met all expectations except "Internal Objective #1: Seamless Cylinder Selling."  Weathersby Dep., Ex. 14.  Mollison observed that "Stephen's TDS scores . . . trailed the Region and Nation; however, he had six new hires during the year."  *Id.* at 4.  Mollison further noted the following about Weathersby:

2

Stephen has had a challenging year across several fronts including some personnel challenges, teaming issues, motivation, PSS accountability, territory ownership, etc.  On the personnel side, he has added six new representatives to the team during the year that has led to some obvious challenges.  Perhaps the most distracting were some of the teaming and trust issues that surfaced in the 3rd quarter with a couple of his teams.  It was these issues that seemed to take its toll on Stephen and the District as it boiled over and negatively impacted their BEM meeting in Angola.  It was at this point where Stephen[']s commitment and passion for success was evident.  He could have walked away from these challenges, but he really stepped up and asked for coaching and guidance on how he could get his team back on track.   He has accepted this coaching, increased his communication, participated in the Leadership Imperative, went back to product training and has modified his coaching style/approach with his entire team. . . . There is no question to Stephen's level of commitment, passion and coachability.

*Id.*  Mollison gave Weathersby an overall rating of "Good: Performance met overall expectations."  *Id.* at 5.

From January 2005 through December 2006, Berkhout, who is Caucasian, was Weathersby's supervisor.  Berkhout Dep. at 6. In January 2005, Mollison forwarded Berkhout an email sent to Mollison from Christina M. Isakson ("Isakson"), a direct report of Weathersby's, that included a string of emails between Isakson and Weathersby.  In her email to Mollison, Isakson stated: "We had talked previously about communication styles with my district manager, so I know you are familiar with some of the communication challenges my team and I have had with our manager."  Berkhout Aff., Ex. 3 at 1.  The string of emails begins with Weathersby sending a schedule to his direct reports of when he would be riding along with them in the field.  *Id.* at 2.  Isakson responded: "Seeing as I am a part-time employee, if you could pick one field travel day instead of two (as you did with all the other full time people), I think that would be more appropriate.  Please let me know which of the 2 days you would rather use for a ride-along in my territory."  *Id.*

3

Weathersby responded: "As your Manager I determine how many days I will spend with a team member during a field visit.  If you would like to discuss this further, please contact me tomorrow.  Or we can discuss this during my field visit next Monday and Tuesday."  *Id.* at 1.

In January 2005, Mollison also forwarded to Berkhout an email from human resources regarding a situation that happened in the fall of 2004 between Weathersby and David Kirkpatrick ("Kirkpatrick"), a direct report of Weathersby.  Berkhout Aff., Ex. 4.  Kirkpatrick wrote Karen Gray ("Gray") of human resources a six-page letter indicating concerns that Weathersby had wrongly accused him of over-distributing product sample.  *Id.*  Mollison sent an email to Gray following a meeting with Weathersby and Kirkpatrick, who agreed at the meeting that there had been some "mis-communications" and that "there was no intent behind any of these communications."  *Id.*

Around this time, Berkhout learned that one of Weathersby's direct reports, Eric Cox, had a three-month delinquency on his corporate account.  Berkhout Aff. at ¶ 12.  Berkhout consulted with George Mathew ("Mathew"), a Senior Employee Practice Partner, about how to handle the situation.  Mathew Aff. at ¶ 6.  Shortly thereafter, Weathersby had issues with two of his direct reports—John Clayton and Jeffrey Dahmer—who AstraZeneca ultimately discharged.  Berkhout Aff. ¶ 13.

At the start of 2005, Weathersby's sales numbers were well above target.  *Id.* at ¶ 16.  During his mid-year review of Weathersby, Berkhout encouraged Weathersby to use "prep funds," which are "funds designed to promote developmental and educational programs" and to "aggressively . . . drive peer-to-peer programs."  *Id.* at ¶ 16.  During the third trimester of 2005, the Indianapolis District was number one for specialty care in Trx

market share increase.  Berkhout Dep. at 78-80.  Still, by the end of 2005, Weathersby's sales numbers had declined in all areas below the district and the region.  Berkhout Aff. ¶ Berkhout Aff. at 7.  Furthermore, for the year Weathersby had spent only 55% of his "prep" budget and 51% of his "peer-to-peer" spending.  *Id.*

In January 2006, two of Weathersby's direct reports, Melinda Funk ("Funk") and Laurena Moore, contacted and met with Berkhout about concerns they had regarding Weathersby's management style.  *Id.* at ¶ 18.  Berkhout followed up the meeting with an email to Weathersby and the two direct reports to resolve that Weathersby would monitor the tone of communication and would timely respond.  *Id.*  Berkhout sought guidance from Mathew in addressing this situation.  Mathew Aff. at ¶ 7.

Also in January 2006, Jessica Whidden ("Whidden"), a peer of Weathersby, reported to Berkhout that Weathersby demonstrated flawed interviewing techniques during interviews they conducted together.  *Id.* at ¶ 19.  More specifically, she told Berkhout that Weathersby "failed to control the interviews, forgot questions mid-stream, was unprepared to share his management style with candidates, and informed a candidate that he was 'looking for a soldier.  Someone who can Git R Dun.'"  *Id.*; Berkhout Aff., Ex. 10.  According to Weathersby, Berkhout did not attend any interviews with Weathersby, but he did attend interviews with and provided training to other Caucasion members of his team.  Weathersby Dep. 75-76.

In February 2006, Whidden forwarded Berkhout an email from Michelle Meredith-Bowen ("Meredith-Bowen"), another DSM, who had contacted Whidden because Weathersby had not timely responded to her.  *Id.* at 20, Ex. 11.

In late February 2006, Berkhout met with Weathersby to complete Weathersby's 2005 performance evaluation.  *Id.* at ¶ 21.   Berkhout rated Weathersby's "Valued Performance" as "Partially Met."   *Id.* at Ex. 12.   Berkhout described in the assessment several reasons for this conclusion: Weatherby's district underperformed in 2005 in that the market share for Seroquel was the lowest in the region and showed little growth for the year; the district's call activity and Peer-to-Peer programs lagged behind the region; and Weatherby's leadership and managerial skills were "not at a level equal to his tenure in the role" based on a comparison of Weathersby to his peers in the areas of deliverables, decision-making, and engagement.  *Id.*  In a follow-up email, Berkhout also indicated that they had discussed at the meeting that Weathersby had not taken "the lead role in the interview process" with Whidden and that one of the sought after interviewees became disinterested after the interview process; that many of the employees under Weathersby's management would seek insight from Whidden rather than Weathersby; and that maybe Weatherby's skill set was better suited for a different role.  *Id.* at Ex. 13.   In the email, Berkhout gave Weathersby specific action items to do in response to Berkhout's concerns. *Id.*  He also laid out several expectations for Weathersby to complete by April 30, 2006, including: grow Seroquel by 0.40 each month, spend a certain amount of funds on programs, lead his team to make a certain amount of calls per day, and fill out coaching forms within five days of field visits.   *Id.*  Berkhout made clear that if Weathersby did not meet these goals, he would place Weathersby on a formalized Action Plan.   *Id.*

On February 27, 2006, Wendy Steil ("Steil"), a direct report of Weathersby, informed Berkhout that a customer called Weathersby a "real ass—" and told her not to bring

Weathersby back to her office because he had questioned the customer about her failure to prescribe more Seroquel.  Berkhout Aff., Ex. 14.

On March 9, 2006, Weathersby sent Berkhout an email responding to the action items.  Pl's Ex. H.  He explained that the particular interviewee who lost interest in the position was not interested in the job to begin with, according to her manager.  *Id.* at AZ/SW001704.  He indicated that he spoke with Whidden about his representatives who were seeking her advice.  *Id.*  She told him that she had shared this information with Berkhout in order to demonstrate the synergy between their teams, not to demonstrate a lack of leadership by Weathersby.  *Id.*  Weathersby disputed Berkhout's "concerns regarding this being the proper job (DSM)" fit and explained that this type of communication made him feel uncomfortable:

> I feel that everything I say or do is being examined/scrutinized to validate your impression of me (regarding this being the proper job fit).  I feel that I am being singled out more so than any other member of your team.  I feel that I am under constant scrutiny by you for everything that I do.  I have concerns about our communication last year and how it is contributing to our working relationship this year.  Jim, there are several e-mail[s] I sent you in 2005 in which you either never responded [] or deleted without reading or deleted several months after receiving them (without responding).  When this type of non-communication occurred I felt devalued as a direct report of yours.  I have mentioned to you on two occasions that I have never attended Core I training for DSM. . . . You did send your new hires to Core I DSM Training.

*Id.*  Weathersby also questioned the expectations that Berkhout told Weathersby he must meet by April 30, 2006.  As far as the growth rate of Seroquel, the .40% rate Berkhout told him he must reach was Weatherby's "WAG," or "Woop-Ass Goal," that Berkhout and Weathersby had discussed earlier that year.  *Id.*  The goal for the nation was .19% per month.  *Id.*  Weathersby expressed concern about spending so much of his budget for the

year by April 30 considering his team had scheduled and planned events for later in the year that would require the use of some of those resources. *Id.* at AZ/SW 001705. He also had concerns about reaching the calls per day given that he had new employees under him and that would make the calls per day goal difficult to meet. *Id.* He pointed out that the nine full-time employees reporting to him in 2005 averaged 6.4 calls per day. *Id.* He agreed to complete coaching forms within five days of field visits, but questioned whether Berkhout was requiring this of all of his DSMs. *Id.* He also stated:

> Jim, I feel as if I am being singled out for the challenges that the region is facing. Are these same requirements being asked of the other members of your management team? With me being the only person of color within the region and one of four African American DSM in CNS SC, I believe I bring a diverse perspective to AstraZeneca, the CNS TA and my team in Indiana.

*Id.* The "challenges" had to do with Medicaid formulary issues and whether Seroquel was recognized by certain managed entities. Berkhout Dep. at 77. Berkhout failed to take these issues into consideration when drafting Weathersby's 2005 and 2006 evaluations. *Id.*; Weathersby Dep. at 125-26. Furthermore, Weathersby alleged in his deposition that twice during 2005 and 2006 Berkhout said to him, "My job, my goal is to get you out of here by every way possible." Weathersby Dep. at 129.

Berkhout sought guidance from Mathew, who suggested that Berkhout and Cindy Byers ("Byers"), Berkhout's boss and the Area Sales Director of the Central Nervous System team, meet with Weathersby. Mathew Aff. ¶ 8. Berkhout and Weathersby met on March 16, 2006, in Merrillville, Indiana. Berkhout Aff. ¶ 25. At the meeting, Berkhout spoke with Weathersby about his leadership, but did not address the specific concerns of Weathersby's March 9, 2006, email. Weathersby Dep. at 86. Following the meeting,

Berkhout sent Weathersby an email with information regarding training available through AstraZeneca. Berkhout Aff., Ex. 16. In particular, Weathersby was expected to participate in a feedback exercise, the Hay Group Survey/360 Review ("the Hay Group Survey") with his team. *Id*. Berkhout informed Weathersby that the "Management Excellence" course Weathersby wanted to attend would not be worthwhile for someone of Weatherby's tenure, but suggested he could attend "Coaching  for Success" and the "Effective Employee Relations Seminar." *Id*. These recommendations by Berkhout were based on an email from Kevin Ball, a Management Team Leader, who said, "I don't think Management Excellence, which is the DSM intro course[,] would benefit him. It's for brand new DSMs that are a month out." Berkhout Aff., Ex. 16.

On May 17, 2006, Weathersby met with Berkhout and Byers about AstraZeneca's expectations of Weathersby. Byers Aff. ¶ 15. Several days later, on May 24, 2006, Weathersby emailed Steil regarding her first trimester results. Pl.'s Ex. P. Weathersby notified her of areas on which she needed to take action, and that if she did not, he would need to formalize an Action Plan for her. *Id*.

On July 18, 2006, Berkhout met with Weathersby for his 2006 mid-year review. Through June 2006, Weathersby's Seroquel numbers were 69.9% as compared with 76.2% for the region. Weathersby Dep., Ex. 7 at AZ/SW000119. His calls per day were 6.9 compared with 6.8 for the region. *Id*. His numbers for Zomig, another product his team marketed, were at 42.4% as compared with 49.9% for the region. *Id*.

On July 31, 2006, Funk emailed Berkhout a document entitled "Concerns with Career Ladder IV Process." Berkhout Aff., Ex. 18. She described how she had expressed her desire to pursue advancement to Weathersby, who at first was supportive. *Id*. at

9

AZ/SW001786.  However, he later called her and told her that she was not qualified, but he did not take time to discuss with her why for over a month.  *Id.*  She found this delay "very unacceptable."  *Id.*

On August 3, 2006, Weathersby emailed Berkhout about a situation that happened with Steil.  Pl.'s Ex. F.  Steil had not been truthful to Weathersby about a speaker program she was supposed to arrange.  *Id.*

At this point, Berkhout consulted with Mathew and Byers about Weathersby's sales numbers and performance deficiencies.  Berkhout Aff. ¶ 28; Byers Aff. ¶ 156.  They decided to put Weathersby on an Action Plan.  Berkhout Aff. ¶ 28; Byers Aff. ¶ 156.  On August 8, 2006, Berkhout met with Weathersby to discuss and implement the Action Plan.  Weathersby Dep. at 115; Berkhout Aff. ¶ 28.  The Action Plan addressed the following "unacceptable performance":

> • Failure to take strategic accountability for your district's performance and create a plan for success
>
> • Failure to effectively lead the district
>
> • Failure to address ongoing performance concerns pertaining to PSS's on your team who have had a low level of productivity, as it relates to their ongoing workday activities and promotional activities
>
> • Failure to proactively engage your PSS's in developmental discussions
>
> • Failure to submit AZER expense reports in a timely fashion, which has resulted in your corporate AMEX account becoming delinquent
>
> • Failure to keep a monthly calendar of planned days in the field via Microsoft Outlook

Berkhout Aff., Ex. 20.  On August 9, 2006, the day after Weathersby and Berkhout discussed the Action Plan, Weathersby's doctor placed him on short-term disability until

September 18, 2006.  Weathersby Dep. at 122; Berkhout Aff.  ¶ 30.  On August 29, 2006, while on leave, Weathersby filed a charge with the Equal Employment Opportunity Commission ("EEOC").   Weathersby Dep. at 122.   When Weathersby returned, he requested clarity regarding the Action Plan.  Berkhout revised the Action Plan several times.  Berkhout Aff. ¶ 30.  The final version was in effect starting November 3, 2006. Berkhout Aff., Ex. 22.

On October 15, 2006, Berkhout sent an email to Courtney Collier-Beyer ( "Collier-Beyer"), Mathew's interim replacement, Byers, and John Bogan.  Pl.'s Ex. J.  He stated in the email that Weathersby sent him an email that contained "serious tones of discrimination."  *Id.*  The thoughts he expressed regarding Weathersby's email are as follows:

> This is unacceptable to me.  If I'm discriminating against him, I need him to come forward with it to HR as soon as possible.  I would be more than happy to answer any questions relating to my treatment of Stephen.  He is not only questioning my professional behavior, but my behavior as a human being. I do not have to put up with this in the workplace.

*Id.*  Additionally, Berkhout explained at his deposition that he felt as if the email Weathersby sent him was a "personal jab."  Berkhout Dep. at 176.

On October 24, 2006, Steil contacted the employee call center and reported that Weathersby was "disrespectful," "aggressive," and "mean."  Brown Aff. ¶ 6.  Danlyn Brown ("Brown"), the Senior Employee Practice Partner who replaced Mathew, conducted the investigation.   Brown's colleague interviewed four randomly selected members of Weatherby's sales team, one of whom was Julie Simonton ("Simonton").   *Id.* at ¶ 9. Simonton said that Weathersby had an "intimidating" style, that he made statements that made her "fearful" of her job, and that her work environment was "hostile."   *Id.* at ¶ 10.

On October 31, 2006, Brown, Berkhout, Byers and Collier-Beyer met with Weathersby to discuss Weathersby's Action Plan.  At that time they also discussed the Hay Group Survey that Weathersby's team completed about him.  Brown Aff. at ¶ 7.  The purpose of the survey is to provide feedback on leadership, and the survey is supposed to be confidential.  Berkhout Dep. at 188-19; Weathersby Dep. at 94, 123.  According to the survey, Weathersby's direct reports had the following verbatim statements regarding Weathersby's key strengths:

> COMPASSION FOR EACH PERSON PERSONALLY AND PROFESSIONALLY.
>
> Goal setting, goal achievement measurement, task assignments, meeting leadership.
>
> He is extremely dedicated to his position and AstraZeneca.  He is very loyal, committed and helpful.  Very genuine, caring and understanding.
>
> Stephen can work well on projects by himself.  When left alone he can concentrate on individual tasks well.
>
> This is very difficult to answer objectively.  I cannot say thath [sic] he is a strong leader [sic] he has difficulty relating to his employees.
>
> Caring for his people.  Streamlining communication.  Focusing on Main Thing.  Creating an environment for individuals to exceed.  Praise and recognition for job well done.

Weathersby Dep., Ex. 5; Dkt. No. 35-2 at 66.

Weathersby's direct reports had the following to say about areas where Weathersby needed to improve:

> Better follow through, more timely follow through, more responsive.  Better district efficiency.
>
> Communications skills, self-development of each PSS, multi-tasking, and decision making skills.

Try not to get too caught up in nonsense of some of his employees.

I think that he needs to improve his communication and coaching skills.  He is not approachable and is often defensive.  When he is trying to "coach" an employee he tends to start off right away in a combative way and then finish up with the positives.  I believe that if he started off highlighting the positives and then shared what he sees as opportunities to improve,[sic] would go along [sic] way in creating a positive work environment.  He tends to be punitive in his approach which closes the two-way communication process.  He doesn't clearly communicate his expectations and is often vague then wants to hold an employee accountable to something specific when he was not specific.  He also is inconsistent with how he treats his team.  He has a difficult time motiving his employees.   His tone and stance are often demeaning.

Weathersby Dep., Ex. 5; Dkt. No. 35-2 at 67.

On November 20, 2006, Brown met with Weathersby to discuss the allegations by Steil and Simonton.  Brown Aff. at ¶ 11.  Weathersby explained to her that Steil and Simonton were poor performers who raised concerns about him to detract from their performance issues.  *Id*.  Weathersby had sent an email to Simonton in May of 2006 regarding her poor performance, threatening to place Simonton on an Action Plan if her performance did not improve.  Pl.'s Ex. Q.  Furthermore, in emails dating October 6, 2006, Whidden stated that Simonton "is always trying to play the angle" and Berkhout characterized her as "[l]ong on excuses, and short on action."  Pl.'s Ex. G.  As part of the investigations, a colleague of Brown's also spoke with Johanna Ward, Sean Ridner, and Heather Bosely, each of whom had very positive things to say about Weathersby.  Pl.'s Ex. N.  Likewise, on November 17, 2006, Lessa Glass, a former subordinate of Weathersby, sent Weathersby an email thanking him "for all of [his] guidance, direction and developing," and stating that she "completely respect[s] him as a manager," and that he "supported [her], encouraged [her], and helped [her] through difficult times."  Pl.'s Ex. I.

13

On December 13, 2006, Berkhout sent Brown an updated Action Plan reflecting Weatherby's lack of progress.   Brown Aff. ¶ 13.   Additionally, Brown finished her investigation report regarding the complaint made by Steil, and she recommended that Weathersby be demoted to a pharmaceutical sales role or offered a mutual consent resignation for the following reasons:

> Stephen did not complete the requirements of the AP.   Specifically, he behaved in an insubordinate manner and he did not complete tasks after consistent requests and coaching from his manager.   There was substantiation by two of his [direct reports], Wendy Steil and Julie Simonton, that his behavior towards them was aggressive, threatening, and intimidating. Additionally, there were complaints from his PSSs and his counterparts about his job performance and knowledge, which were confirmed by his manager.

Brown Aff. ¶ 14, Ex. 9.

On December 15, 2006, Weathersby, Berkhout, and Brian Smith (Byers' peer in lieu of Byers) met in person, and Brown joined them by phone, to discuss Weathersby's performance under the Action Plan.   *Id.* at ¶ 15.   Brown informed Weathersby of the group's collective decision to demote him, unless he would like a mutual consent discharge.   *Id.*; Berkhout Dep. at 188.   Weathersby's Action Plan was supposed to last for sixty days, but he was demoted after forty-five days.   Weathersby Dep. at 94, 137-38; Berkhout Aff. at ¶ 31, Ex. 22.  Furthermore, Weathersby understood that according to AstraZeneca's policies, an employee who does not meet all of the objectives of an Action Plan may be placed on a Performance Improvement Plan, but that AstraZeneca did not offer that option to Weathersby.   Weathersby Dep. at 93-91.   On December 26, 2006, Weathersby accepted the reassignment.   Brown Aff. at ¶ 16.

During the relevant time period, Berkhout supervised six other DSMs, all of whom were Caucasian.   Of these, Weathersby emphasizes one potential comparator: Elizabeth

14

Stanton ("Stanton" or "Betsy").  Stanton received  "Partially Met" scores on her 2005, 2006,

and 2007 evaluations, all of which were performed by Berkhout.  Pl.'s Ex. K, L, and M;

Berkhout Dep. at 214-16.  Berkhout did not place Stanton on an Action Plan because "what

[he] saw from her was obviously a clear plan of action to try to rectify [the poor

performance], so there was no need to move to a plan."  Berkhout Dep. at 214-16.  In the

"Inspire Our People to Realize Their Full Potential and AZ's Ambitions" portion of Stanton's

2007 Annual Review, Berkhout discussed the Hay Group Survey that Stanton's team

completed about her:

> Betsy recently completed a 360 degree feedback review with her
> team . . . She received positive feedback from the team in the area of
> climate, with strengths in the areas of team commitment, rewards, and clarity.
> Her opportunity for additional focus is in the area of flexibility.  She also had
> a nice balance within the leadership styles, with visionary, affiliative, and
> coaching being her predominant strengths.

Pl.'s Ex. M at AZ/SW001147.  Elsewhere, Berkhout described feedback from the Hay

Group Survey "showed a balance across the leadership styles, and a positive climate with

an emphasis on rewards, commitment, and clarity."  *Id.* at AZ/SW001153.  He also noted:

"The PSS team is delivering on call execution, etc., but something is missing.  Betsy has

hesitated in furthering her plans for creating change and success, including a change in

personnel."  *Id.*  Ultimately, Stanton decided  that the role of DSM was not a good fit for her

and moved to an individual contributor role.  Berkhout Dep. at 216-17.  Berkhout described

the reasons for this transition in Stanton's 2007 review:

> This is Betsy's 3rd year in the DSM role.  Her level of engagement, work ethic,
> and passion are 2nd to none in the region.  Unfortunately, the outstanding
> efforts haven't led to strong financial results in the Milwaukee District.  The
> team's level of execution, and PREP delivery is also very strong, but is not
> creating the performance needed to win in this market.  Betsy and I talked in
> great detail about her current situation, and what else is possible for her in

2008.  After taking the time to reflect, Betsy is interested in securing a specialty PSS role moving forward.

Pl.'s Ex. M at AZ/SW001153.

On May 12, 2008, Weathersby filed the instant action alleging that his demotion was the result of unlawful discrimination and/or retaliation in violation of Title VII of the Civil Rights Act of 1964.

## II.  <u>STANDARD</u>

Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(c), which provides in relevant part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec.*

16

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. **DISCUSSION**

### A. **DISCRIMINATION CLAIM**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  There is no direct evidence of discrimination in this case.  *See* Dkt. No. 44 at 13.  Therefore, in order to survive summary judgment, Weathersby must proceed under the indirect burden-shifting analysis established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).

Under the indirect method, Weathersby must make the following prima facie showing: (1) he was a member of the protected class; (2) he was meeting AstraZeneca's legitimate job expectations; (3) AstraZeneca subjected him to a materially adverse employment action; and (4) AstraZeneca treated similarly situated persons outside his protected class more favorably.  *See McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009); *Greene v. Potter*, 557 F.3d 765, 768 (7th Cir. 2009).  "When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second [legitimate expectation] and fourth [similarly situated] prongs of the *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably."  *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002).  Thus, Weathersby may try to show that AstraZeneca had different sets of employment expectations, one for him and one for his Caucasian counterparts.  *See Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007).

The parties do not dispute that Weathersby is a member of a protected class and that AstraZeneca subjected him to a materially adverse employment action—the demotion. Weathersby argues that Stanton—who like Weathersby was not meeting AstraZeneca's legitimate expectations—was similarly situated to Weathersby and that AstraZeneca treated her better than Weathersby. Weathersby argues Stanton was similarly situated in that she was supervised by Berkhout and she received "Partially Met" scores on her annual evaluations. Dkt. No. 44 at 15-16. However, Weathersby argues that unlike him, Berkhout did not place Stanton on an Action Plan, and Berkhout did not demote her—she chose to step down. *Id.* at 16. Furthermore, Weathersby argues that several times he requested DSM training, which Stanton received, but Berkhout never provided him with this training. *Id.* Weathersby argues that Berkhout did not attend interviews with Weathersby or otherwise train him in the field, but he did provide such field training to other Caucasian DSMs. *Id.* Finally, Weathersby argues that Berkhout required him to participate in the Hays Group Survey but did not require his Caucasian team members to do so.

The undisputed evidence demonstrates that Weathersby and Stanton are alike in the ways Weathersby argues: they were both DSMs supervised by Berkhout who were not meeting his legitimate expectations because their sales numbers were low. However, the undisputed evidence also demonstrates many differences between Weathersby and Stanton. Weathersby fails to provide any evidence that Stanton suffered complaints by her direct reports, peers, or Berkhout regarding her personnel management style. Weathersby, on the other hand, was the subject of many complaints. His direct reports complained about his communication style (Iakson, Kirkpatrick, Steil, and Simonton), his lack of timely communication (Funk), management style (Funk and Moore), and his

19

alienation of a customer (Steil).   Two of his peers also noticed deficiencies in his management regarding the timeliness of his communication (Meredith-Bowen) and his professionalism during interviews (Whidden).   Additionally, Weathersby fails to provide evidence that Stanton neglected administrative tasks; on the other hand, one basis for the Action Plan for Weathersby was his "[f]ailure to submit AZER expense reports in a timely fashion, which . . . resulted in [his] corporate AMEX account becoming delinquent." Berkhout Aff., Ex. 20.

Furthermore, the record demonstrates that Berkhout required Stanton to participate in the Hays Group Survey and that she was rated highly by her direct reports.   Weathersby offers no evidence to dispute Berkhout's proffered reason for not placing Stanton on an Action Plan—because she effectively created a plan for herself.   Finally, Berkhout did not demote Stanton, but at the end of her third year he did have a detailed discussion with her about "her current situation, and what else is possible for her in 2008."   Pl.'s Ex. M at AZ/SW001153.   Based on Weathersby's March 9, 2006, letter to Berkhout, Berkhout had a similar discussion with Weathersby during his third year as a DSM, regarding whether the role of DSM was a good job fit for Weathersby.   Weathersby argues that AstraZeneca "has offered no evidence that Stanton would have been demoted had she not suggested it"; however, Stanton stepped down before Berkhout or AstraZeneca needed to make such a decision.

"[A]n employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity."   *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).   Here, however, the substantial evidence shows that Weathersby and Stanton were not similarly situated in many material respects.

20

Moreover, the undisputed evidence does not indicate that AstraZeneca treated Stanton better than Weathersby given their respective situations.   *See Pantoja*, 495 at 847. Accordingly, Weathersby has failed to establish a prima facie case for his race discrimination claim, and AstraZeneca's Motion for Summary Judgment as to this claim is **GRANTED**.

## B.  RETALIATION CLAIM

Weathersby also argues that a genuine issue of material fact exists regarding his retaliation claim.  Dkt. No. 44 at 18.  Weathersby can prove retaliation under either the direct or indirect method.  *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Under the direct method of proof, Weathersby must show direct or circumstantial evidence: "(1) that [he] engaged in activity protected by Title VII; (2) that [he] suffered an adverse action taken by [AstraZeneca]; and (3) a causal connection between the two."  *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009).

Plaintiff argues that he engaged in three instances of protected conduct: the March 9, 2006, email to Berkhout in which he described feeling singled out and uncomfortable and mentioned the diverse perspective he brought being African-American; the charge of discrimination he filed with the EEOC on August 29, 2006; and email he sent Berkhout "containing serious tones of discrimination" in October 2006.  AstraZeneca does not contest this protected activity or that Weathersby suffered an adverse employment action.  Rather, AstraZeneca argues that Weathersby cannot show a causal connection between the two.

AstraZenca argues that Berkhout first alerted Weathersby to his performance

deficiencies in 2005, prior to Weathersby's first protected activity.   Dkt. No. 38 at 24.
AstraZeneca further argues that the management complaints against Weathersby began
with Mollison in December 2004, and ended with Brown's investigation of Steil's complaints
and Brown's recommendation that he be demoted in December 2006.  *Id.*  AstraZeneca
also argues that Berkhout was only one of many decision-makers.  *Id.*  Finally, AstraZeneca
argues that the only evidence Weathersby offers to link the protected activity and the
demotion is the timing, and "suspicious timing alone is rarely sufficient to create a triable
issue."  *Id.* at 25 (quoting *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 904 (7th Cir. 2005)).

Weathersby argues he can establish a causal connection based in part on
suspicious timing: he was demoted only three months after he sent the email to Berkhout
that Berkhout described has having "serious tones of discrimination."  Dkt. No. 44 at 20.
Weathersby further argues that Stanton was similarly situated, did not complain of race
discrimination, and was not demoted or placed on an Action Plan.  *Id.* at 21.  Additionally,
Weathersby argues that "a reasonable fact finder could conclude that the decision to
demote [Weathersby] was based on Berkhout's anger towards [Weathersby] for
complaining three times of race discrimination."  *Id.*  In particular, Weathersby points to
Berkhout's email stating that Weathersby's email was "unacceptable" to Berkhout and that
he did "not have to put up with this in the workplace."  *Id.*  Weathersby argues that Berkhout
decided to demote Weathersby after Weathersby filed the EEOC charge.  Weathersby says
that the combination of Berkhout's email, his deposition testimony, and Weathersby's
EEOC charge create a strong inference that AstraZeneca's proffered reason for
Weathersby's demotion is really pretext for unlawful retaliation.  Finally, Weathersby argues
that he presented evidence that he met many of the criteria of his Action Plan but

AstraZeneca demoted him before placing him on a PIP and before the expiration of the Action Plan.

"[T]he mere fact that one event preceded another does nothing to prove that the first event caused the second; the plaintiff also must put forth other evidence that reasonably suggests that [his] protected speech activities were related to [his] employer's discrimination. *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007) (quoting *Burks v. Wis. DOT*, 464 F.3d 744, 758-59 (7th Cir. 2006)). In addition to the fact that Weathersby was demoted shortly after his protected speech activity, Weathersby also provides evidence that Burkhout was agitated about Weathersby's protected activity. In fact, Burkhout, who did not receive any training from AstraZeneca regarding retaliation, Berkhout Dep. at 37-38, stated that he did "not have to put up with this in the workplace," the implications of which unclear at best. Weathersby also provides evidence, albeit disputed, that he was not given the full time to complete his Action Plan before being demoted and that he was entitled to less severe action prior to the demotion. Given all of this evidence, there remains a genuine issue of material fact as to whether Weathersby's demise of demotion was inevitable based purely on his performance or whether Weathersby's protected activity pushed his superiors to demote him without providing him the same opportunity to recover as if he had not engaged in the protected activity. Accordingly, AstraZeneca's Motion for Summary Judgement on Weathersby's retaliation claim is **DENIED**.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, AstraZeneca's Motion for Summary Judgment (Dkt. No.

33) is **GRANTED in part** and **DENIED in part**.


IT IS SO ORDERED this 19th day of March, 2010.




_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution to:

Sylvia Abra Bier
LITTLER MENDELSON, P.C.
sbier@littler.com

Denise K. LaRue
HASKIN LAUTER  & LARUE
dlarue@hlllaw.com

Alan L. McLaughlin
LITTLER MENDELSON PC
amclaughlin@littler.com

Bradley L. Wilson
HASKIN LAUTER  & LARUE
bwilson@hlllaw.com